CASE   19.—ACTION BY  MUTUAL  MANUFACTURING  COM-
        PANY AGAINST CHARLES MOORE  &  CO.—Feb-
        ruary 23, 1910.

## Mutual Mfg Co. v. Charles Moore & Co.

Appeal from Logan Circuit Court.

W. P. Sandidge, Circuit Judge.

Judgment for defendant, and plaintiff appeals.—
Reversed.

1.  Pleading—Conclusions of Law.—In an action for the price
    of goods, an answer merely alleging that the goods were not
    manufactured in compliance with the food and drug act
    (Act June 30, 1906, chapter 3915, 34, Stat. 768 [U. S. Comp.
    St. Supp. 1909, p. 1187]), as required by the contract, simply
    pleaded a conclusion of law.
2.  Principal and Agent—Fraud—Sufficiency of Evidence.—Evi-
    dence held insufficient to show that a contract for the sale
    of goods to defendant by plaintiff was obtained by fraud
    of plaintiff's agent.

    R. W. DAVIS and WESLEY V. PERRY for appellant.

    S. R. CREWDSON, for appellee.

Opinion of the Court by Wm. Rogers Clay, Com-
missioner—Reversing.

On May 13, 1908, appellant, Mutual Manufacturing
Company through its traveling agent entered into a
written contract with Charles Moore, trading and
doing business under the firm name of Charles Moore
& Co., by which it sold the latter an assortment of
soaps, perfumes, and other toilet articles for the sum
of $280.53.   There were 70 articles included in the bill

of sale.  The prices to be paid for the articles ranged from 40 cents up to $21.  The first article set out in the contract is "25 dozen · Mutual Laundry soap, amount $11.25." The agent who secured the contract called on Charles Moore at his grocery in Russellville, Ky.  He spent the greater part of the day there.  The agent and Charles Moore read the contract over together.  Among the terms of the contract are the following:

"Guarantee—All our goods are manufactured in compliance with the requirements of the Food and Drug Act, June 30, 1906.  If any article purchased in this order proves unsatisfactory as to quality after using one-half of it, return the name of consumer and cause of complaint, and we will refund price paid. And it is further arranged that if the dealer should have more of any article than his trade demands, or for any reason desires to make an exchange for other goods, such goods will be received at the full purchase price at any time within one year.  Goods so returned must be accompanied by a new order for goods of an equal value.  Goods cannot be returned for credit on account.

"Other Merchandise—Merchandise described in Catalog of Merchandise for Double Value Selling will be furnished in connection with this agreement free of cost with reorders as fully explained on other side.

"Terms—Cash, 30 days 5 per cent, or the amount of this order may be paid in four equal payments due in 3—6—9—12 months from date of invoice, provided purchaser sends us promptly, on arrival of goods, his acceptance, for amounts and time of above payments, payable to our order at Canton, Ohio.  If acceptance is not sent, terms are cash.  The purchase is made and agreement entered into under arrangement and rep-

resentation herein expressed and no others. Authority of salesman is limited to making agreements and taking orders on this regular printed form, and have no authority to make any agreement not written or printed herein.

"When goods are delivered to transportation company, in good order, they become the property of the purchaser, subject to all the conditions and safeguards expressed herein. Purchaser pays all transportation charges."

The contract contained the further provision that, if the purchaser did not make a profit of at least 45 per cent. on the money invested, appellant would at the end of one year from the date of the first payment make up this profit in cash or buy back at the purchase price all unsold goods originally purchased, provided the purchaser properly displayed the goods during the year, and used due diligence in extending sales by furnishing his customers the Double Value Plan with passbooks, and also availed himself of the exchange plan and made settlements as agreed; and to perpetuate this system of advertising, the purchaser agreed to send the appellant by registered mail, between the 1st and 15th of each month, the names of 50 bona fide residents of his community, to whom the appellant would forward the regular advertising matter.

After talking the matter over for sometime, appellee signed the contract, and the order embracing the contract was then mailed to appellant at Canton, O. It reached appellant at that place on May 14, 1908. Thereupon appellant advised appellee of the receipt of the order and shipped the goods on the same day. On the next day appellee wrote appellant, countermanding the order embraced in the contract of May

13, 1908. This letter did not reach appellant until May 15, 1908. At that time the goods had already been shipped. On May 19, 1908, appellee wrote appellant the following letter: "The Mutual Manfg. Co., Canton, Ohio. Gentlemen: Yours of 16th to hand and contents carefully noted. We cannot handle the goods you say you are shipping at all. You certainly received my letter in time to stop shipment of goods. However, if you have shipped them anyway we will pay freight back. You say that these goods have been shipped several days when you received my order. Now this can't possibly be the case as only 3 days have expired from time order was taken until I received reply from my letter. Gentlemen, we do not care to inconvenience you in this matter, but are satisfied we can't make them pay us, and of course it would not pay you and at end of year the goods would only have to be sent back. Hoping that you can see this as we do, we remain, as ever yours, Chas. Moore & Co."

On May 25, 1908, appellee wrote appellant the following letter: "Mutual Manfg. Co., Canton, Ohio. Gents: We are always ready to do the right thing. As we wrote you we can't use these goods. We have simply made a mistake in buying them, and you say in your letter that you would have been glad to countermand our order had the goods not gone forward when you heard from us. Now, we have offered to pay all transportation and in addition to this we will pay you $10.00. You see, we will then be out about $20.00, and it does seem to me that any one who wants to do the fair thing would do this. You claim that your commissions for selling the goods amounts to several dollars. Now, if you will let us take this matter up with the old gentleman who sold us the

goods I am sure that we can settle it in this way. We are really not able to pay for the goods, as your contract would require us to pay for them. In other words we simply haven't the money. Hoping this will prove satisfactory, we remain as ever, Chas. Moore & Co."

On June 5, 1908, appellee wrote appellant the following letter: "Mutual Manfg. Co., Canton, Ohio. Gents: We do not think that we will be able to sell these goods at all and therefore would not be able to pay for them unless we could sell them first. I mean we could not raise the money to meet these payments. Now, the impression was made on my mind that these goods were to be paid for when sold. But in looking at the contract which I had signed hurriedly, I find that I was mistaken. It was then that I asked you to countermand my order. Now, we do not want the goods and want you to take them back. We do not want to have any trouble over the matter. We want to settle it in a fair way. Gentlemen, you can see from the tone of my letters that we want nothing but what is right. We would be of no advantage to you at all further than the profit of this particular bill of goods. What will you do and have the goods returned? Respt., Chas Moore & Co."

A few days after the shipment of the goods by appellant they were received at Russellville. At that time appellee Charles Moore was serving on the grand jury. The driver of his wagon received the goods, and delivered them at appellee's grocery. Appellee claims that he did not know the goods were there until some time after that. As appellee declined to pay for the goods, appellant, about four months after the goods were shipped, instituted this action in the Logan circuit court to recover the sum of $280.53, the

purchase price of the articles sold. Appellee in his answer and amended answer presented several defenses. One was to the effect that the goods were not manufactured in compliance with the food and drug act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Com. St. Supp. 1909, p. 1187]). The court properly sustained a demurrer to this paragraph of appellee's answer, for the reason that no facts were alleged showing wherein the goods manufactured did not comply with the requirements of the food and drug act, and under the circumstances the averments of this paragraph simply pleaded a conclusion of law. There was a further plea to the effect that the contract in question was simply an order, which was not to become effective until accepted by appellant. Manifestly this plea was not sufficient, for the contract was not of the kind that required an acceptance by appellant before it became binding; and, even if it were of that character, it was accepted and the goods shipped before the letter countermanding the same was received by appellant. Appellee's chief defense, however, was that the contract was obtained by fraud. Evidence was heard upon this issue, the case was then submitted to the court without the intervention of a jury, and judgment rendered in favor of appellee. From that judgment this appeal is prosecuted.

Upon the plea of fraud the evidence is to the effect that appellee was in the grocery business, and was engaged in handling laundry soaps. He desired a soap that would sell in competition with other soaps on the market. Appellant's agent represented to him that the Mutual laundry soap was as large and as good as Bragg's soap. The agent thereupon took down from one of appellee's shelves a cake of Bragg's

soap, and found that it weighed 12 ounces. He said that Mutual laundry soap weighed the same, and the quality of it was just as good. Appellee did not desire the other articles which he purchased, but bought them solely for the purpose of exchanging them for laundry soap whenever he desired to do so. He would not have signed the contract except upon the condition that he could exchange the other 69 articles for laundry soap. One laundryman, to whom a cake of the Mutual laundry soap was given by appellee several months after the goods were received by him, and after suit was instituted stated that he did not think the soap was of good quality. It was further shown that it did not weigh 12 ounces; it weighed only 8 ounces. Appellee did not sell, or attempt to sell, any of the articles purchased; he did not examine any article except the laundry soap. The question, then, is whether or not this evidence is sufficient to justify the court in rendering judgment in favor of appellee.

In the first place, the contract is not so obscure and complicated as to be unintelligible; its terms are perfectly plain. Instead of the provisions of the contract being a badge of fraud, as contended by counsel for appellee, they appear to us to be perfectly fair and reasonable. Under the contract appellee had the right, if any article proved unsatisfactory as to quality, after using one-half of it, to return the article, with the name of the consumer and cause of complaint, and obtain from appellant the price paid for the same. Furthermore, he had the right at any time within one year, if he found that he had more of any article than his trade demanded, or if for any reason he desired to make an exchange for other goods, to exchange such

goods for other goods of equal value. There was also
a guaranty of a certain profit and an obligation on
the part of appellant to make up this profit in cash,
or buying back at the purchase price all unsold goods,
provided appellee used due diligence in advertising
and selling, or attempting to sell, the goods. As the
Mutual laundry soap was only one of many articles,
and under the terms of the contract appellee had the
right to exchange this soap for other goods of equal
value, it is manifest that a misrepresentation as to
this particular soap, would not, under the circum-
stances, be material, unless, as appellee claims, he
purchased the whole bill of goods merely for the pur-
pose of exchanging all other articles for Mutual
laundry soap.

As stated before, the contract of sale embraced 70
different articles. The· value of all the goods pur-
chased amounted to $280.53. Of this sum the amount
to be paid for the Mutual laundry soap was $11.25.
The mere statement of appellee, to the effect that he
purchased 69 different varieties of soaps and toilet
articles, of the value of $269.28, with the view of
having them shipped to him from Canton, Ohio, and
thereafter returning them as he saw fit, for the sole
purpose of exchanging such articles for Mutual laun-
dry soap, carries with it its own improbability. Fur-
thermore, immediately after the execution of the
contract, he wrote to appellant countermanding the
order. A few days later, in his letter of May 19, 1908,
above set out, he gives as a reason for not accepting
the goods the fact that his firm could not handle the
same. Further along in the same letter he states that
they could not make the goods pay. In his letter of
May 25, 1908, he states that his firm is not really able
to pay for the goods as the contract would require

them to pay. "In other words," he says, "we simply haven't the money." Again, on June 5, 1908, after the goods had been received, and he had an opportunity to inspect them he says: "We do not think we will be able to sell these goods at all and therefore would not be able to pay for them unless we could sell them first. I mean we could not raise the money to meet these payments."

All these letters were written before suit was brought. In none of them does appellee charge appellant with fraud. There is no intimation in them that he bought the other 69 articles of goods merely for the purpose of exchanging them for laundry soap. There is no suggestion even that the laundry soap was not of the size and quality represented by appellant's agent. Never until suit was brought was there even a suggestion that the contract was obtained by fraud. When we consider the improbability of appellee's · having purchased 69 other varieties of soaps and toilet articles for the purpose of exchanging them for Mutual laundry soap, in connection with his immediate effort to countermand the order and his subsequent insistence that appellant take the goods back because he did not have the money to pay for them, or believed that he could not make the goods pay, we conclude that appellee's plea of fraud is simply an afterthought, or a scheme devised to relieve himself from the consequences of a contract which he attempted to repudiate within a short time after its execution.

We are of opinion that the trial court erred in finding for appellee, as its finding is flagrantly against the evidence. The judgment is therefore reversed, and cause remanded for proceedings consistent herewith.